UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

Eastern District of Kentucky
**FILED**

AUG 05 2009

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 7:07-CV-26

JOHN THACKER, Individually and on Behalf
of all Others Similarly Situated, and
JACKSON ROWE, INC., Individually and
on Behalf of Others Similarly Situated,                    PLAINTIFFS,

v.                          **OPINION AND ORDER**

CHESAPEAKE APPALACHIA, L.L.C.,
NiSOURCE INC. and COLUMBIA
ENERGY GROUP,                                             DEFENDANTS.

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on the Plaintiffs' motions (DE 73) for the following relief:

1)    the preliminary approval of a settlement agreement;
2)    the preliminary certification of a settlement class;
3)    the conditional appointment of settlement class counsel and settlement class
      representatives;
4)    the approval of the form and manner of notice; and
5)    the scheduling of a formal fairness hearing.

At the hearing on this matter, the Defendants stated they had no objection to the Plaintiffs'

motions. The Court, having reviewed the record and heard from counsel for the parties will certify

the matter as a class action for settlement purposes; preliminarily approve the settlement agreement;

appoint Stites & Harbison PLLC as class counsel; and conditionally approve the form and manner

of notice proposed by the Plaintiffs. In addition, the Court will set this matter for a formal fairness

hearing to be held on November 10, 2009 at 1:00 p.m. in the federal courthouse at Pikeville,

Kentucky. Any motion for attorney's fees will be heard at the same time.

## I.       BACKGROUND.

### A.       Named Parties.

The named Plaintiffs in this matter are John Thacker and Jackson Rowe, Inc. In their

Complaint, they assert that Thacker owns an interest in the oil and gas estate underlying a tract of

property located in Martin County, Kentucky and that Jackson Rowe owns an interest in the oil and

gas estate underlying a tract of property located in Pike County, Kentucky.  (DE 55, Amended

Complaint ¶ ¶ 20, 21).  They filed this action in their individual capacity and on behalf of all others

similarly situated.  The Defendants are Chesapeake Appalachia, L.L.C. ("Chesapeake"); NiSource

Inc. ("NiSource") and Columbia Energy Group ("Energy Group").     (See DE 55, Amended

Complaint).

### B.       Claims.

### 1)       Fraud and Breach of Contract.

In their Complaint, the Plaintiffs assert that Chesapeake is the lessee of the oil and gas estate

the Plaintiffs own.  (DE 55, Amended Complaint ¶ ¶ 20, 21, 22).  They assert a breach of contract

claim against Chesapeake, asserting that Chesapeake has not paid them royalties in the manner

required under the leases.  (DE 55, Amended Complaint ¶ ¶ 23-25).

The Plaintiffs also assert a fraud claim against Chesapeake, asserting that Chesapeake sent

reports and information to them that failed to show that Chesapeake was deducting certain losses and

expenses from the royalties paid to the Plaintiffs and that Chesapeake failed to accurately show how

it was calculating the royalties paid to the Plaintiff.  (DE 55, Amended Complaint ¶¶ 28-30).

In their current motion, the Plaintiffs assert that all of  the Defendants misrepresented

"virtually all of the information contained on the Plaintiffs' periodic royalty statements, including

2

misrepresenting charges imposed upon lessors for gathering, processing, and related post-production expenses." The Plaintiffs also allege that all of the Defendants "improperly measured and then misrepresented the volume of Plaintiff's gas on the royalty statements, failing to account for or disclose gas lost in transportation through Defendant's pipelines." (DE 73, Memorandum at 6). At the hearing on this matter, the Plaintiffs further clarified that their Complaint asserts a fraud claim against all Defendants.

**2)      Civil Conspiracy and Joint Venture.**

The Plaintiffs assert that all three Defendants – Energy Group, Nisource, and Chesapeake – conspired with each to sell the natural gas produced from the wells on the Plaintiffs' property at a price less than the fair market value for the gas as required by the leases. (DE 55, Amended Complaint ¶ ¶ 36, 38).

NiSource and Energy Group are relevant to this matter because they owned two entities that were predecessors in interest to Chesapeake. One of these entities was Columbia Energy Resource and the other was Columbia Natural Resources. Energy Group owned these predecessor entities until November 1, 2000. At that time, NiSource bought Energy Group and, thus, became the indirect owner of the predecessor entities. Energy Group sold the entities on August 23, 2003. Eventually the predecessor entities were merged into the Defendant Chesapeake. (DE 73, Mem. at 3-4).

The Plaintiffs assert that NiSource and Energy Group have acknowledged their liability for claims arising from certain sales agreements they caused the predecessor entity Columbia Natural Resources to enter into while they owned it. The first of these agreements was entered into on December 1, 1999, while Energy Group still owned Columbia Natural Resources. The Plaintiffs assert that Energy Group directed Columbia Natural Resources to enter into a  contract requiring it

3

to sell natural gas to an entity called Mahonia II from February 2000 to January 2004 at a fixed price per unit of gas. (DE 72, Memorandum at 5). In return Columbia Natural Resources received $ 150 million which the Plaintiffs assert was used by Columbia Natural Resources to buy Energy Group's stock on the open market to defend against a hostile takeover attempt of Energy Group by NiSource. (DE 72, Memorandum at 5).

The second of these contracts was entered into on August 24, 2000, after NiSource had purchased Energy Group. The Plaintiffs assert that NiSource and Energy Group collectively directed Columbia Natural Resources to enter into this contract which required Columbia Natural Resources to sell gas to Mahonia II at a fixed price of $2.82 per mcf. (DE 72, Memorandum at 5). In return, Columbia Natural Resources received $250 million which the Plaintiffs assert was appropriated by Energy Group and Nisource to fund certain "golden parachute" packages of Energy Group executives and also to fund NiSource's acquisition of Energy Group. (DE 72, Memorandum at 5).

The Plaintiffs assert that, after the Mahonia contracts were closed, the market price of natural gas rose dramatically, reaching more than $16.00 per mcf. (DE 72, Memorandum at 5). The Plaintiffs assert that the Defendants never notified them of the Mahonia II contracts and fraudulently concealed them by failing to disclose on the Plaintiffs' royalty statements that the royalty rate was based on the price for gas set forth in the Mahonia II contracts. (DE 73, Mem. at 6).

### 3) Indemnification Claim against NiSource and Energy Group.

The Plaintiffs also assert claims against NiSource and Energy Group for indemnification. They assert that NiSource and Energy Group agreed to indemnify Chesapeake for liability arising from the types of claims asserted by the Plaintiffs and that the Plaintiffs are third-party beneficiaries of those indemnification agreements. (DE 55, Amended Complaint ¶¶ 46-48).

4

**4)    Reformation of "Flat Rate" or "Fixed Rate" Leases.**

In their current motion, the Plaintiffs also assert that the Defendants' leases that contain a

"flat rate" or "fixed rate" royalty clause must be reformed.  (DE 73, Memorandum at 6).  The

Plaintiffs explain that a "flat rate" royalty clause is one which calls for the payment of a specified

sum to a lessor on a regular basis, independent of the volume of gas actually produced.  A "fixed

rate" lease is one which calls for the payment of a set rate, multiplied by the volume of gas actually

produced.  In their motion, the Plaintiffs assert that these leases contain very low price terms relative

to the current market rate.  (DE 73, Mem. at 6).  They further assert that these leases must be

reformed to pay royalties based on the market rates and the volume of production.

In their Complaint, the Plaintiffs request punitive damages, the certification of a class, and

compensatory damages.

**II.    CERTIFICATION OF SETTLEMENT CLASS.**

This matter is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure. Rule 23 sets forth certain requirements for the certification of a class action, and requires

that any dismissal or compromise of the action must be approved by the court.

The party moving to certify the class has the burden of proving that class certification is

appropriate. *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996).  The Court

must conduct a "rigorous analysis" of the elements of Rule 23 before certifying a class. *Gen. Tel. Co.

v. Falcon*, 457 U.S. 147, 161 (1982); *see also* Fed.R.Civ.P. 23.  The standard is heightened when the

certification is for the purpose of settlement. *See Int'l Union, United Auto., Aerospace, and Agric.

Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 625 (6th Cir.2007) (citing *Amchem

Prods.*, 521 U.S. at 620).

5

The Plaintiffs filed the motion for class certification for the purpose of finalizing a settlement of this matter. The requirements of Rule 23(a) and (b) must be satisfied before a court certifies a class for trial or for settlement-only purposes. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

Rule 23(a) provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Plaintiffs argue that this suit fits within category 3 of Rule 23(b) which provides the following:

A class action may be maintained if Rule 23(a) is satisfied and if. . . (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

## A.   Class Definition.

"Before delving into the 'rigorous analysis' required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Bentley v. Honeywell International, Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004). Important elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner. *Id.*

In their motion, the Plaintiffs set forth the following proposed settlement class definition:

> All persons entitled to the payment of a lessor's royalty by Defendants under natural gas leases owned by Defendants at any point from February 5, 1992 and up to and including April 23, 2009, covering real property within the boundaries of the Commonwealth of Kentucky.

(DE 73, Memorandum at 12).

The class definition would permit the Court to objectively determine class membership. Further, the class definition specifies a particular group in a particular location harmed by the manner in which the Defendants paid royalties in a particular time frame.

### B.    Rule 23(a) Factors.

### 1)    Numerosity.

The numerosity requirement is satisfied when a class contains so many members that joinder of all would be impractical. In their Complaint, the Plaintiffs assert that the "Defendants have approximately 1,200 Kentucky leases and pay royalties on over 2,400 wells." (DE 73, Memorandum at 12). They further assert that "[t]he number of payees likely exceeds the number of wells." At the hearing on this matter, the Plaintiffs explained that there are typically multiple payees on each lease such that the class size would be approximately 7,000 people.

"The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980). "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *AMS*, 75 F.3d at 1079. A class size of 7,000 individuals satisfies the numerosity requirement.

### 2)    Commonality.

The Court must find that there are questions of law or fact common to the class.

7

Fed.R.Civ.P. 23(a). "The commonality test is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class.'" *AMS*, 75 F.3d at 1080 (internal quotations and citation omitted).

The Plaintiffs have sufficiently established that there are questions of law and fact common to all class members. These common legal or factual questions include whether the reports and information Chesapeake sent the class members failed to show that Chesapeake was deducting certain losses and expenses from the royalties paid to the class; failed to accurately show how Chesapeake was calculating the royalties paid to the class; and improperly measured the volume of gas for which Chesapeake was obligated to pay royalties and misrepresented that volume. The common legal and factual issues also include whether the Mahonia contracts violated the Defendants' obligation to sell the natural gas produced from the wells at its fair market value.

### 3)    Typicality.

The court must also find that the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *AMS*, 75 F.3d at 1083 (citation omitted).

In their motion, the Plaintiffs assert that they have alleged claims that arise from the same actions by the Defendants that harmed the potential class members. Specifically, the Plaintiffs assert that 1) the Mahonia contracts breached the leases of all the potential class members because those transactions artificially lowed the royalties received by all class members; 2) that the assessment of post-production charges to lessors affected all class members uniformly; 3) that Chesapeake

8

uniformly and falsely reported volumes and deductions on the same royalty statement form which was sent to all class members; and that 4) all flat-rate and fixed-rate leases have been rendered unconscionable.

It appears that not all of the class members will have a flat-rate or fixed-rate lease and, thus, this claim may not be typical for all class members. For example, at the hearing on this matter, the Plaintiffs explained that none of Plaintiff Jackson Rowe's leases is a flat-rate or fixed-rate lease. Nevertheless, one of the Plaintiff Thacker's leases is a flat-rate lease. Thus, the class members with a flat-rate or fixed-rate claim will be adequately represented by one of the Plaintiffs.

Based upon the Plaintiffs' representations regarding the claims of the potential class members, the Court finds that the Plaintiffs have sufficiently established that their claims are typical of the potential class members.

**4)      Adequacy of representation.**

The court must find that the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). There are two criteria for determining this element: 1) the representatives must have common interests with the unnamed class members, and 2) it must appear that the representatives will vigorously prosecute the class action through qualified counsel. *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir.1976).

In their motion, the Plaintiffs state that they and the class members share the common goal of maximizing recovery for the class and that there is no conflict between them. The Court finds the Plaintiffs have sufficiently established they have common interests with the other class members and that there is no apparent conflict between the Plaintiffs and the potential class members. Accordingly, the Court will appoint the named Plaintiffs as Class Representatives.

Rule 23(g) requires that the Court must appoint class counsel.  The rule further directs that, in making that appointment, the Court must consider:

     (1)    the work counsel has done in identifying or investigating potential claims in the action;

     (2)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

     (3)    counsel's knowledge of the applicable law; and

     (4)    the resources that counsel will commit to representing the class;

Fed. R. Civ. P. 23(g)(1)(A).

The rule also directs that "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23 (g)(4).

In their motion, the Class Representatives assert that they have engaged competent class counsel and outline the discovery, litigation, and settlement work performed by their counsel thus far in this action. The Class Representatives also recite the qualifications of their counsel, including expertise in Kentucky natural resources law and class action litigation.  The Court finds that the law firm of Stites & Harbison, PLLC will fairly and adequately represent the interests of the class. Accordingly, the Court will appoint Stites & Harbison, PLLC as Class Counsel in this matter.

## C.    Rule 23(b) – Predominance and Superiority.

The class must additionally meet one of the three criteria in Rule 23(b).  In their motion, the Class Representatives assert that the proposed class meets the criteria in Rule 23(b)(3), which requires that "the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for

10

fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3)(emphasis added).

### 1)    Predominance.

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class members' case as a genuine controversy can be achieved using generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re Livent, Inc. Notholders Sec. Litig.*, 210 F.R.D. 512, 517 (S.D. N.Y. 2002)

In their motion, the Class Representatives assert that "[t]here are numerous common issues relating to Defendants' liability – including, but not limited to[,] Defendants' entry into the Mahonia transactions, Defendant's unilateral choice to assess post-production costs to all lessors, and Defendants' uniform misrepresentation of gas volumes and post-production costs on royalty statements that went to all lessors." These issues would be subject to generalized proof and would predominate over the individual issues of the extent of the allegedly unlawful assessment of post-production costs to all lessors and other damages issues.

Accordingly, the Class Representatives have sufficiently established that the predominance requirement of Rule 23(b)(3) is satisfied.

### 2)    Superiority.

Rule 23(b)(3) states that, in determining whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, the Court should consider:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

In their motion, the Class Representatives assert that there is no evident interest by class members in individually controlling separate actions. They further asserted that this is likely because no individual class members will be entitled to enough damages to warrant the costs of an individual lawsuit. At the hearing on this matter, however, Class Counsel asserted that the damages among the class members will vary widely, with some entitled to relatively large damages. Thus, it appears that a few of the class members may have some interest in pursuing this action on their own. However, the majority of the class members would likely have no interest in pursuing an action on their own and would benefit from the pooled resources of a class action.

In their motion, the Class Representatives also assert that "there is no other litigation against Chesapeake encompassing the issues raised in this case of which the Class Representatives are aware that has been commenced in Kentucky." (DE 73, Memorandum at 17). However, in a footnote, they mention "one putative class action. . . which encompasses a small subset of the issues at stake in this case." That case is *Poplar Creek Dev. Co., Inc. v. Chesapeake Appalachia, L.L.C.*, No. 7:08-cv-00190-GFVT (E.D. Ky. 2008).

In that case, the plaintiff Poplar Creek, like the Class Representatives in this action, owns oil and gas estates in property located in Kentucky. (*See Poplar Creek*, No.7: 08-cv-00190-GFVT, DE 40). Also like the Class Representatives in this action, Poplar Creek, entered into a lease with Chesapeake. Finally, like the Class Representatives in this action, Poplar Creek alleged that Chesapeake made impermissible deductions for post-production costs from the price of the gas before calculating and paying the appropriate royalties to the lessors.

Poplar Creek did not, however, assert any claims based upon the Mahonia contracts or improper measurement of gas, or challenging the flat-rate provided for in certain leases. Further, the

12

*Poplar Creek* action has recently been dismissed and, thus, no longer has any relevance to the issue of whether a class action is the superior method for resolving the action before this Court. The parties have not set forth any other litigation commenced by the proposed class members and the Court is unaware of any.

As to the third factor, given that all of the proposed class members would have an interest in real property located in Kentucky, the Eastern District of Kentucky appears to be a convenient forum to resolve this controversy.

Finally, the fourth factor need not be considered when class certification is only for settlement purposes. *Amchem Products,* 521 U.S. at 620.

Accordingly, the Court finds the Class Representatives have sufficiently established the superiority requirement.

For all these reasons, the Class Representatives have sufficiently satisfied the requirements of Rule 23(a) and (b). Accordingly, the Court finds that certification of the class for the purposes of settlement is appropriate in this case.

## III.   PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT.

Once a class has been approved, the Court may approve a settlement that will bind class members "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The procedure for approving a class action settlement includes three steps: (1) the court must preliminarily approve the settlement; (2) the class members must be given notice of the proposed settlement; and (3) the court must hold a hearing to determine whether the proposed settlement is fair, reasonable and adequate. *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier,* 262 F.3d 559, 565-66 (6th Cir. 2001).

"Preliminary approval of a proposed settlement is based upon the court's familiarity with the issues and evidence, as well as the arms-length nature of the negotiations prior to the proposed settlement, ensuring that the proposed settlement is not illegal or collusive." *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 370 (S.D. Ohio 1990). "Once preliminary approval has been granted, a class action settlement is presumptively reasonable, and an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable." *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 550 (S.D. Ohio 2000) (citing *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir.1983)).

"Fairness calls for a comparative analysis of the treatment of class members vis-a-vis each other and vis-a-vis similar individuals with similar claims who are not in the class." Federal Judicial Center, Manual for Complex Litigation 315 (4th ed.2004).

The proposed settlement calls for the contribution by the Defendants of $28,750,000.00 to a settlement fund (the "Settlement Fund"). In exchange for the settlement amount, the class members release the Defendants from any and all liability for past conduct.

The individual notices, which will be mailed to each class member at his or her last known mailing address, will set forth the minimum amount each class member is entitled to receive as part of the settlement. The amount of each class member's settlement payment will be determined according to an allocation method that depends on the volume of gas produced from that member's wells, when it was produced, and the type of lease involved. The allocation method proposed by the parties was provided to the Court at the hearing on this matter and is attached to this Opinion as Exhibit 1. The parties represented at the hearing that the allocation method will be available to each class member on a website that will be established to disseminate information regarding the

14

settlement. Class members will be notified of the website in the notices sent to them.

At the hearing, the parties explained that the proposed allocation method is similar to that used in other oil and gas class action and that it is "fairly customary." The parties further stated that this method was devised to avoid "pitfalls" that had occurred in similar class actions.

In their motion, the Class Representatives state that the proposed settlement is the product of "an extensive, arms-length negotiation process conducted between the parties and their attorneys over a span of approximately four months." (DE 73, Mem. at 9). They assert that the negotiation included the analysis of data regarding gas production volumes, measurement, pricing, deductions, charges, and reporting practices by the Class Representatives' expert Julia Bodamer. The Class Representatives state that they and their counsel "have developed an intimate understanding of the strengths and weaknesses of their claims." (DE 73, Mem. at 9). They assert that they have conducted an in-depth review and analysis of the approximately 1,200 leases owned by the class members. (DE 73 Mem. at 9).

They also assert that, in reaching the settlement, they have considered the "risk that a protracted and contested period of litigation, including certification, dispositive motion practice, trial and likely appeals – which could possibly extend for many years – might lead to a smaller recovery, or no recovery at all, against the Defendants." (DE 73, Mem. at 11).

In their Settlement Agreement, the parties agree that the Class Representatives would receive a maximum of $15,000 each for their services as Class Representatives. In the hearing on this matter, Class Counsel explained that this amount is typical of that given to Class Representatives in other actions. Class Counsel also explained that the Class Representatives have already devoted significant time and effort to this litigation, including meetings with counsel, taking part in

15

discussions regarding litigation strategy and settlement, and sitting for depositions.

The Settlement Agreement provides that Class Counsel will apply for a fee award that will be a maximum of 30% of the $28,750,000.00 Settlement Fund and that this amount will be the only legal fees Class Counsel receives in this action.

As to the issue of any unclaimed amounts remaining in the Settlement Fund, the Settlement Agreement provides that a party may file a motion with the Court to terminate the Settlement Fund and release any unclaimed funds remaining in it. At the hearing on this matter, the parties agreed that they would come back to the Court after the distribution of all claimed amounts to resolve what should be done with any amounts remaining. The Settlement Agreement provides that the Defendants will pay "Administration Expenses." The parties also agreed at the hearing that the Defendants would pay all costs of settlement administration, including payment of the settlement administrator, and that such costs would not be paid from the Settlement Fund.

As to the selection of the Settlement Administrator, the parties stated at the hearing on this matter that they have agreed on Rust Consulting, Inc. The parties further stated that they chose Rust Consulting because it is qualified, has the "right experience," and made a reasonable bid. The Settlement Agreement lists the duties of the Settlement Administrator. At the hearing on this matter, the parties explained that there will be a written contract with the Settlement Administrator which will, among other things, require the Settlement Administrator to submit to the jurisdiction of the Court for purposes of ensuring that it carries out its duties under the Settlement Agreement and the written agreement between the parties and the Settlement Administrator.

At this point, the Court does not find any grounds to doubt the fairness of the proposed settlement. Nor does the Court find any other obvious deficiencies in the settlement and it appears

16

to fall within the range of possible approval.  The proposed settlement does not provide for unduly preferred treatment of the Class Representatives and the attorneys' compensation does not appear to be excessive.  At the hearing on this matter, the Court indicated certain typos contained in the recitals of the agreement.    However, these typos are insignificant to the Court's ability to preliminarily approve the agreement.   Accordingly, the Court will preliminarily approve the proposed Settlement Agreement and will direct that notice be given to class members of a formal fairness hearing.

## IV.    APPROVAL OF FORM AND MANNER OF NOTICE.

Next the Court must review the form and manner that the parties propose to notify potential class members of the settlement and the formal fairness hearing.  Rule 23 (c)(2)(B) requires the Court to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." With regard to class action claims that are settled, Rule 23(e) instructs courts to "direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  "[D]ue process does not require actual notice, but rather a good faith effort to provide actual notice."  *In re Prudential Ins. Co. ov Am. Sales Practices Litig.,* , 177 F.R.D. 216, 231 (D. N.J. 1997)(citing *In re Cherry's Petition to Intervene*, 164 F.R.D. 630, 636 (E.D. Mich. 1996)).

The Class Representatives have submitted two forms of notice to the Court for approval: a Long-Form Notice (DE 73, Ex. 1) and a Publication Notice (DE 73, Ex. 2).   The Class Representatives propose that the Publication Notice be published in the *Lexington Herald-Leader*, and that the Long-Form Notice be mailed to the last-known mailing address of those class members whose addresses can be identified through reasonable efforts.

17

At the hearing on this matter, Class Counsel explained that they chose to publish notice in the *Lexington Herald-Leader* because it is the newspaper with the largest distribution in Eastern Kentucky, where at least the "overwhelming majority" of the oil and gas estates at issue are located. They further explained that, in this action, the Long-Form Notices will likely reach the potential class members because they will be mailed to the address where the Defendants are currently sending the royalty checks at issue.

The Long-Form Notice satisfies the requirements of Rule 23(c)(2)(B) in that it, among other things, 1) explains the nature of the action; 2) defines the class; 3) explains the lawsuit and the claims made in it; 4) explains that a class member may enter an appearance through an attorney if the member so desires; 5) explains that the court will exclude from the class any member who requests exclusion; 6) explains the time and manner for requesting exclusion; and 7) explains the binding effect of a class judgment on members under Rule 23(c)(3).

The Long-Form Notice further 1) informs the recipient of a toll-free phone number, website, and physical address where they can get additional information; 2) explains the amounts to be placed in the Settlement Fund and the kinds of deductions that will be taken from it; 3) explains the allocation formula and sets forth the minimum amount that each class member will receive; 4) sets forth the date this Court will hold a fairness hearing for final approval of the settlement; 5) identifies the Class Counsel and notifies the recipient that Class Counsel will ask the Court to approve payment to them of up to thirty percent (30%) of the Settlement Fund; 6) notifies the recipient that Class Counsel will ask the Court to approve payments of $15,000 each to the Class Representatives; 13) explains how to object to the settlement and how to ask for permission to speak at the fairness hearing; and 14) explains how the recipient can receive a copy of the Settlement Agreement.

18

The shorter Publication Notice provides a toll-free number that recipients may call to obtain the Long-Form Notice. It also describes the class; explains the nature of the action; explains the claims; explains the amounts in the Settlement Fund and the kinds of deductions; explains that the recipient can exclude himself from the settlement and object to the settlement; sets forth the date for the fairness hearing and explains that the recipient can appear there; and directs the recipient to the toll-free number, website, and physical address for further information.

The Court finds the proposed notices reasonable and will approve them with certain conditions. There is a typographical error on page two of the Long-Form Notice, in the response to question 7. The Court suggests that the phrase "is paid" be inserted after the word "royalty." In addition, the blank spots contained in both notices should be completed with the appropriate information prior to mailing or publication.

At the hearing, Class Counsel proposed that the notices be published approximately 45 days prior to the date set for the formal fairness hearing. Specifically, they proposed that the Long-Form Notices be mailed by **September 10, 2009** and that the Publication Notice be published in the *Lexington Herald-Leader* **September 13, 2009**, which falls on a Sunday, the day of the week with the widest circulation. Class Counsel further proposed that the deadline for class members to opt out of the settlement, to object to the settlement, and to give notice of intent to appear at the final fairness hearing would be **October 12, 2009**. The parties proposed that the formal fairness hearing would be conducted some time during the week of **November 2, 2009.** Both parties agreed that the proposed timely was "fairly normal" in class action settlements.

Based upon the parties' representations, the Court finds the proposed form and manner of notice is the best notice practicable under the circumstances. The Court further finds the proposed

19

timeline reasonable. However, the Court's schedule requires that the formal fairness hearing take

place **November 10, 2009**. Further, while in their proposed order the Class Representatives propose

that the hearing take place in Lexington, Kentucky, the Court finds the hearing should take place in

Pikeville, Kentucky. This matter was assigned to the Pikeville jury division. Further, the parties have

represented that, at least, the "vast majority" of property at issue in this matter is located in Eastern

Kentucky. Thus, in consideration for the convenience of the potential class members, the Court will

order that the formal fairness hearing take place in Pikeville, Kentucky.

## V.  CONCLUSION.

For these reasons, the Court hereby ORDERS as follows:

1)  The Class Representatives' unopposed motion to certify this action as a class action

is GRANTED and this matter is CERTIFIED as a class action for settlement

purposes only on behalf of the following class:

All persons entitled to the payment of a lessor's royalty by
Defendants under natural gas leases owned by Defendants at any
point from February 5, 1992 and up to and including April 23, 2009,
covering real property within the boundaries of the Commonwealth
of Kentucky;

2)  The Class Representatives' unopposed motion for preliminary approval of the

Settlement Agreement is GRANTED and the parties' proposed settlement agreement

is PRELIMINARILY APPROVED;

3)  The Class Representatives' unopposed Motion for Approval of the Form and Manner

of Notice is GRANTED conditional upon the necessary additions and corrections

noted by the Court in this Opinion including the dates set forth above for opting out,

objecting to the settlement, and giving notice of intent to appear at the fairness

hearing. Class Counsel is DIRECTED to cause the Long-Form Notice to be mailed to the last-known mailing address of each class member by **September 10, 2009** and to cause the Publication Notice to be published in the **September 13, 2009** edition of the Lexington-Herald Leader;

4) The Court hereby APPOINTS the law firm of Stites & Harbison PLLC as Class Counsel;

5) Class Counsel SHALL FILE by **September 10, 2009** a motion in accordance with Fed. R. Civ. P. 23(h) requesting the Court to award reasonable attorney's fees in an amount not to exceed 30 percent of the Settlement Fund. Any objections to the motion shall be filed no later than **October 12, 2009**, and any responses to objections shall be filed by **October 26, 2009. A hearing on the motion for attorney's fees is SET for November 10, 2009 at 1:00 p.m. at the federal courthouse in Pikeville, Kentucky**

6) The Court hereby DESIGNATES John Thacker and Jackson Rowe, Inc. as Class Representatives;

7) The Class Representatives' unopposed motion to schedule a formal fairness hearing is GRANTED and **a formal fairness hearing to determine whether the settlement should be given final approval is SET for November 10, 2009 at 1:00 p.m. at the federal courthouse in Pikeville, Kentucky**;

8) Class Counsel **SHALL FILE** in the record by **October 26, 2009** an affidavit identifying the persons to whom notice has been mailed and the persons who have opted out of the settlement; the persons who have objected to the settlement; and the

21

persons who have given notice of intent to appear at the formal fairness hearing. Class Counsel **SHALL ALSO FILE** in the record a copy of all objections to the settlement; and

9) The Court hereby APPOINTS Rust Consulting, Inc. as Settlement Administrator to perform the functions and duties of Settlement Administrator as defined in the Settlement Agreement. Class Counsel SHALL FILE in the record of this matter a copy of the agreement with the Settlement Administrator.

This the 5th day of August 2009.



Signed By:
*Karen K. Caldwell*
United States District Judge