UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

CIVIL ACTION NO. 7:07-CV-26

JOHN THACKER, Individually and on Behalf
of all Others Similarly Situated, and
JACKSON ROWE, INC., Individually and
on Behalf of Others Similarly Situated,                           PLAINTIFFS,

v.                          **OPINION AND ORDER**

CHESAPEAKE APPALACHIA, L.L.C.,
NiSOURCE INC. and COLUMBIA
ENERGY GROUP,                                                   DEFENDANTS.

**** **** **** ****

This matter is before the Court on the motion filed on behalf of the Class Representatives and the Certified Class for final approval of the Settlement Agreement (DE 119) entered into with Defendants Chesapeake Appalachia, L.L.C., NiSource Inc., and Columbia Energy Group;  and on the Motion  for Attorney's Fees (DE 82) filed by the attorneys appointed by the Court as counsel for the certified class ("Class Counsel").

The Court has reviewed the motions, and has considered all relevant objections filed with the Court. In addition, on November 10, 2009, the Court conducted a Fairness Hearing on the proposed settlement and invited all persons who had filed Notices of Intent to Appear at the hearing to comment as well as any other person present.

Pursuant to Fed. R. Civ. P. 23(e), and for the reasons set forth herein, the Court finds that Class Counsel provided notice of the settlement to all potential Class Members in a reasonable manner, that the objections received lack merit, that the Settlement Agreement is fair, reasonable,

and adequate, and the Plan of Allocation is fair.

## I.    BACKGROUND.

### A.    Named Parties.

The named Plaintiffs in this matter are John Thacker and Jackson Rowe, Inc. In their Complaint, they assert that Thacker owns an interest in the oil and gas estate underlying a tract of property located in Martin County, Kentucky and that Jackson Rowe owns an interest in the oil and gas estate underlying a tract of property located in Pike County, Kentucky. (DE 55, Amended Complaint ¶ ¶ 20, 21). They filed this action in their individual capacity and on behalf of all others similarly situated. The Defendants are Chesapeake Appalachia, L.L.C. ("Chesapeake"); NiSource Inc. ("NiSource") and Columbia Energy Group ("Energy Group"). (See DE 55, Amended Complaint).

### B.    Claims.

### 1)    Fraud and Breach of Contract.

In their Complaint, the Plaintiffs assert that Chesapeake is the lessee of the oil and gas estate the Plaintiffs own. (DE 55, Amended Complaint ¶ ¶ 20, 21, 22). They assert a breach of contract claim against Chesapeake, asserting that Chesapeake has not paid them royalties in the manner required under the leases. (DE 55, Amended Complaint ¶ ¶ 23-25).

The Plaintiffs also assert a fraud claim against Chesapeake, asserting that Chesapeake sent reports and information to them that failed to show that Chesapeake was deducting certain losses and expenses from the royalties paid to the Plaintiffs and that Chesapeake failed to accurately show how it was calculating the royalties paid to the Plaintiff. (DE 55, Amended Complaint ¶¶ 28-30).

The Plaintiffs assert that all of  the Defendants misrepresented "virtually all of the

information contained on the Plaintiffs' periodic royalty statements, including misrepresenting charges imposed upon lessors for gathering, processing, and related post-production expenses." The Plaintiffs also allege that all of the Defendants "improperly measured and then misrepresented the volume of Plaintiff's gas on the royalty statements, failing to account for or disclose gas lost in transportation through Defendant's pipelines." (DE 73, Memorandum at 6). At a hearing, the Plaintiffs further clarified that their Complaint asserts a fraud claim against all Defendants.

### 2) Civil Conspiracy and Joint Venture.

The Plaintiffs assert that all three Defendants – Energy Group, Nisource, and Chesapeake – conspired with each to sell the natural gas produced from the wells on the Plaintiffs' property at a price less than the fair market value for the gas as required by the leases. (DE 55, Amended Complaint ¶ ¶ 36, 38).

NiSource and Energy Group are relevant to this matter because they owned two entities that were predecessors in interest to Chesapeake. One of these entities was Columbia Energy Resource and the other was Columbia Natural Resources. Energy Group owned these predecessor entities until November 1, 2000. At that time, NiSource bought Energy Group and, thus, became the indirect owner of the predecessor entities. Energy Group sold the entities on August 23, 2003. Eventually the predecessor entities were merged into the Defendant Chesapeake. (DE 73, Mem. at 3-4).

The Plaintiffs assert that NiSource and Energy Group have acknowledged their liability for claims arising from certain sales agreements they caused the predecessor entity Columbia Natural Resources to enter into while they owned it. The first of these agreements was entered into on December 1, 1999, while Energy Group still owned Columbia Natural Resources. The Plaintiffs assert that Energy Group directed Columbia Natural Resources to enter into a contract requiring it

to sell natural gas to an entity called Mahonia II from February 2000 to January 2004 at a fixed price per unit of gas. (DE 72, Memorandum at 5).  In return Columbia Natural Resources received $ 150 million which the Plaintiffs assert was used by Columbia Natural Resources to buy Energy Group's stock on the open market to defend against a hostile takeover attempt of Energy Group by NiSource. (DE 72, Memorandum at 5).

The second of these contracts was entered into on August 24, 2000, after NiSource had purchased Energy Group. The Plaintiffs assert that NiSource and Energy Group collectively directed Columbia Natural Resources to enter into this contract which required Columbia Natural Resources to sell gas to Mahonia II at a fixed price of $2.82 per mcf.  (DE 72, Memorandum at 5).  In return, Columbia Natural Resources received $250 million which the Plaintiffs assert was appropriated by Energy Group and Nisource to fund certain "golden parachute" packages of Energy Group executives and also to fund NiSource's acquisition of Energy Group.  (DE 72, Memorandum at 5).

The Plaintiffs assert that, after the Mahonia contracts were closed, the market price of natural gas rose dramatically, reaching more than $16.00 per mcf.  (DE 72, Memorandum at 5).  The Plaintiffs assert that the Defendants never notified them of the Mahonia II contracts and fraudulently concealed them by failing to disclose on the Plaintiffs' royalty statements that the royalty rate was based on the price for gas set forth in the Mahonia II contracts.  (DE 73, Mem. at 6).

**3)  Indemnification Claim against NiSource and Energy Group.**

The Plaintiffs also assert claims against NiSource and Energy Group for indemnification. They assert that NiSource and Energy Group agreed to indemnify Chesapeake for liability arising from the types of claims asserted by the Plaintiffs and that the Plaintiffs are third-party beneficiaries of those indemnification agreements.  (DE 55, Amended Complaint ¶¶ 46-48).

4

### 4)      Reformation of "Flat Rate" or "Fixed Rate" Leases.

The Plaintiffs also assert that the Defendants' leases that contain a "flat rate" or "fixed rate" royalty clause must be reformed.  (DE 73, Memorandum at 6).  The Plaintiffs explain that a "flat rate" royalty clause is one which calls for the payment of a specified sum to a lessor on a regular basis, independent of the volume of gas actually produced.  A "fixed rate" lease is one which calls for the payment of a set rate, multiplied by the volume of gas actually produced.  The Plaintiffs assert that these leases contain very low price terms relative to the current market rate.  (DE 73, Mem. at 6). They further assert that these leases must be reformed to pay royalties based on the market rates and the volume of production.

In their Complaint, the Plaintiffs request punitive damages, the certification of a class, and compensatory damages.

### C.      Proposed Settlement.

Following nearly two years of litigation and over four months of arms-length settlement discussions, the parties have agreed upon a proposed Settlement Agreement that brings monetary relief for a group of 8,185 Kentucky landowners who are lessors under natural gas leases with Defendants. Under the terms of the Settlement Agreement and Plan of Allocation, Defendants will contribute $28,750,000.00 to a Settlement Fund.

Estimated settlement payments for Class Members have been calculated under a Plan of Allocation, which provides that proceeds of the Net Settlement Fund will be allocated to Class Members based on the type and duration of the lease held by each Class Member, each Class Member's proportionate interest in the lease, the volume of gas produced under the lease, and a weighting formula. The formula takes into consideration the volume of gas produced from each lease

between February 1992 and April 2009. For periods 1996 and earlier, the data used for settlement payments are estimates. The total volume of gas produced, after certain weighting, was used to calculate each Class Member's percentage interest in the Net Settlement Fund.

The Settlement Agreement covers all claims asserted against the Defendants. In exchange for the $28.75 million payment to the Class, the Settlement Agreement provides for the release of any claims against the Defendants that have been asserted in this Class Action for any and all royalty claims from February 5, 1992 to April 23, 2009. The Settlement Agreement, however, does not release the Defendants from any liability for any conduct after April 23, 2009.

### D.   Preliminary Approval.

After a hearing, by Opinion and Order dated August 5, 2009 (DE 80), the Court preliminarily approved of the Settlement Agreement and certified this matter as a class action for settlement purposes on behalf of the following class:

> All persons entitled to the payment of a lessor's royalty by Defendants under natural gas leases owned by Defendants at any point from February 5, 1992 and up to and including April 23, 2009, covering real property within the boundaries of the Commonwealth of Kentucky.

The Court designated the Plaintiffs John Thacker and Jackson Rowe, Inc. as Class Representatives and appointed the law firm of Stites & Harbison PLLC as Class Counsel. The Court also approved the Class Representatives' unopposed Motion for Approval of the Form and Manner of Notice and directed Class Counsel to cause notices to be mailed to class members at their last-known mailing address and to cause notice to be published in the Lexington Herald-Leader. Finally, the Court appointed Rust Consulting, Inc. as Settlement Administrator to perform the functions and duties of Settlement Administrator as defined in the Settlement Agreement.

6

## II.     THE CLASS HAS BEEN ADEQUATELY NOTIFIED OF THE SETTLEMENT.

Following preliminary approval, Rust Consulting, Inc. (the Settlement Administrator selected by the parties and approved by the Court) mailed Notice of the Settlement to all potential class members via first-class mail and in the form and manner approved by this Court. Short Form Notice of the proposed Settlement was also published in the Lexington Herald Leader on September 20, 2009, also in the form and manner approved by this Court. In addition, the Settlement Agreement and relevant motions and court orders were made available on a website created under the direction of the parties and administered by Rust Consulting.[1]

The Court finds that this notice process is adequate under Fed. R. Civ. P. 23 and the standards of due process, because it was directed in a reasonable manner to all prospective class members who would be bound by the Settlement Agreement and, in a manner that could be understood by the average prospective class member, fairly apprised the prospective class members of the terms of the proposed Settlement Agreement and their options with respect to their decision whether to join in the class.

## III.    DEFENDANTS HAVE COMPLIED WITH THE CLASS ACTION FAIRNESS ACT NOTICE REQUIREMENTS.

The Class Action Fairness Act ("CAFA"), requires each defendant provide notice of a proposed class action settlement to "appropriate" federal and state officials. 28 U.S.C. § 1715. On June 22, 2009, Defendants sent notice of settlement in this Action to the various Attorneys General of the United States, the 50 states and the District of Columbia. Along with that notice, Defendants sent copies of the Complaint, the Notice of Hearing on Plaintiffs' Motion for Preliminary Approval

---

[1] http://www.thackersettlement.com

of the Settlement Agreement, and Plaintiffs' Motion for Preliminary Approval of the Settlement Agreement, including the proposed Notice to the Class and a copy of he proposed Settlement Agreement. *See* 28 U.S.C. § 1715(b). The notice also informed the various Attorneys General of the proposed class definition, and that the majority of Class Members would be Kentucky residents. *Id.*

The sole inquiry regarding the Settlement came from the Attorney General of Ohio who requested information on the number of Ohio Class Members and the Settlement Payments due to them. The Settlement Administrator responded with the relevant information. The Court finds that Defendants have fully complied with the CAFA notice requirements.

## IV.    OPT OUTS AND OBJECTIONS.

Out of 8,185 eligible Class Members, 68 have filed timely elections to opt out of the proposed Settlement, constituting .85% of the Class. The opt outs represent a cumulative total of $36,823.41 of the Net Settlement Fund (.18% of the Net Settlement Fund). Class Counsel submitted the names of the 68 persons who have timely opted out of the settlement. (DE 113).  In an amended affidavit, Class Counsel indicates that one of those individual has withdrawn her notice to opt out. Accordingly, there are 67 individuals who have opted out of the settlement.

Twelve Class Members filed timely objections to the terms of the proposed Settlement Agreement, constituting .15% of the Class.  The amount of the Net Settlement Fund attributable to these objections is $243,846.15 (1.2% of the Net Settlement Fund).

The Court finds that the opt out and objection rates are within the range of reasonableness typically encountered in other class actions.

The objections have all been filed with the Court (DE 113) and can be categorized as follows:

(1)    Ownership disputes regarding the Objector's ownership dates for which they are entitled to royalty payments.  These Objectors do not object to the fairness of the

8

Settlement Agreement itself. These Objectors are Gloria J. Dennis (DE 103), George R. Hale and Pamela S. Hale (DE 102), Rockhouse Oil & Gas, LLC (DE 113), and Pilgrim Energy, Inc. (DE 87);

(2)     Complaints that the relative portion of settlement owed to the Objector is too low.  These Objectors are Janet C. Mullins (DE 114 & 110) and Jewell Bollinger (DE 90 & 92);

(3)     Allegations that Defendants engaged in bad acts outside the scope of this Settlement Agreement so that the amount to be paid to Objector in settlement does not seem fair.  These objectors are Nannie Ruth Ousley and Franklin D. Ousley (DE 106) and  Earl and Margrethe Melton (DE 104);

(4)     Objection to the requested attorney fee award.   This objector is Faye Barrowman (DE 88);  and

(5)     Objection filed by counsel on behalf of Poplar Creek Development Company, Alma Land Company, and Appalachian Land Company ("Poplar Creek Objectors") (DE 97 and 98).

Certain of these objections have now been either stricken by the Court or withdrawn. At the Formal Fairness Hearing, the Court struck as moot the objections of Pilgrim Energy, Inc. after Pilgrim opted out of the settlement (DE 105). After the Formal Fairness Hearing, George R.  Hale and Pamela S. Hale and Gloria J. Cox withdrew their objections (DE 126).

At the Formal Fairness Hearing, Class Counsel indicated that Rockhouse Oil & Gas, LLC has also withdrawn its objections.  However, Rockhouse's name was included on the list of objectors filed by Class Counsel (DE 113).  Class Counsel also filed a copy of the document it characterized as Rockhouse's "objection."  The  Court has been unable to locate in the record any reference to Rockhouse's withdrawal of its objection. Accordingly, the Court has considered the objection.

The Court will address each of the active objections in turn.

**A.     The Rockhouse, Mullins, Bollinger, Melton, and Ousley Objections.**

"Once preliminary approval has been granted, a class action settlement is presumptively

9

reasonable, and an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable." *Levell v. Monsanto Research Corp.,* 191 F.R.D. 543, 550 (S.D. Ohio 2000) (citing *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983)). The Rockhouse, Mullins, Bollinger, Melton, and Ousley objections do not attack the substance of the Settlement Agreement, but rather focus on each objector's individual claim.

It is well settled, however, that "[o]bjections based purely upon individual claims of loss do not warrant disapproval of the proposed settlement." *EEOC v. McDonnell Douglas Corp.*, 894 F. Supp. 1329, 1335 (E.D. Mo. 1995). The Court's role in assessing the fairness of a settlement is not to make a *de novo* evaluation of whether the measures applied to all claimants provide each individual with a satisfactory recovery. *Id.* "Rather, the criteria or methodology employed by the litigants is sufficient if its terms, when applied to the entire group of individuals represented, appear reasonable." *Id.*

In this case, the Rockhouse, Mullins, Bollinger, Melton, and Ousley objections involve disputes regarding the objectors' ownership dates, complaints about individual recoveries, and allegations that the Defendants engaged in bad acts that fall outside the scope of this Action. None of those objections is sufficient to defeat final approval of the proposed Settlement Agreement. Accordingly, these objections are overruled.

### B.    Barrowman Objection to the Requested Attorney Fee Award.

Barrowman objects on the basis that Class Counsel's requested attorneys' fee award is too high, and requests that the requested fee award be reduced by 30%, resulting in a fee award of 21%. The Court notes that Barrowman is the sole Class Member who has objected to the Class Counsel's fee award request.

Using the percentage approach, courts in this jurisdiction and beyond have regularly determined that 30% fee awards are reasonable. *Howes v. Atkins*, 668 F. Supp 1021, 1025 (E.D. Ky. 1987); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"). District Courts in Kentucky have awarded attorneys' fees in other class actions that meet – and exceed – the 30% fee award request submitted by Class Counsel. *See Howes*, 668 F. Supp. at 1027 (approving 40% fee award); *Miracle v. Bullitt County*, 2008 WL 4974799 (W.D. Ky. November 19, 2008) (approving fee award of 30%).

Reduction of the attorney's fees to 21% would result in an award of attorneys' fees that is less than what is typically awarded in similar class actions. Such a result is unwarranted in light of Class Counsel's successful efforts in the face of the significant risks in prosecuting this litigation. Accordingly, the Court overrules the Barrowman objection.

### C.    Objection By Poplar Creek, Alma Land and Appalachian Land.

The Poplar Creek Objectors first object that the Settlement is unfair because it permits Chesapeake to continue deducting post-production expenses from royalty payments to class members in the future. However, Class Counsel explained in its response, that Kentucky courts have never directly addressed the merits of a claim for improper deduction of post-production expenses and volumes. Such claims were recently dismissed by the federal district court in Poplar Creek's parallel class action, *Poplar Creek Development Co. v. Chesapeake Appalachia, LLC*, Civ. No. 7:08-000190-GFVT (E.D. Ky.).

Class Counsel explains that they have determined the likelihood of success on the merits for this claim is not as strong as some of the other claims. Thus, they did not find any benefit in

11

requiring, as part of the settlement, that the Defendants cease taking the deductions. In addition, the Court notes that the Settlement Agreement does not release the Defendants for any conduct occurring after April 23, 2009.  Thus, to the extent that the Defendants continue to engage in the conduct complained of in this action and such actions are found to violate Kentucky law, the Class would be entitled to compensation for those acts.

The Poplar Creek Objectors argue that the Settlement Agreement permits too large a recovery for flat-rate leaseholders who the Poplar Creek Objectors argue have little to no claims in this action. In deciding whether to approve the settlement, however, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

Further, the Amended Complaint alleges that Defendants breached the leases when they "paid royalties calculated by a method other than as a fraction of the market value of the gas at the time of production multiplied by the volume of gas produced." Thus, the Amended Complaint would seem to include a claim that flat-rate lessors were entitled to payment of a fractional-rate royalty.

The Poplar Creek objectors have pointed to no case law indicating that Kentucky courts would prohibit the retroactive reformation of a flat-rate lease into a 1/8th royalty lease.  Class Counsel, however, has submitted with their response one unpublished opinion by the Kentucky Court of Appeals permitting such a reformation.

Finally, there is no indication that fractional-rate lessors are getting less of the settlement amount because the flat-rate lessors are included in the settlement.  Instead, Class Counsel has stated that, if the flat-rate lessors were not included in the settlement, the settlement amount would be reduced.

12

The Poplar Creek Objectors argue that the settlement amount is too small given the likelihood of success on the merits.  The Poplar Creek Objectors point to the result achieved in *Estate of Tawney v. Columbia Natural Resources, LLC,* 633 S.E. 2d 22 (W.Va.2006), which involved claims under West Virginia law similar to those asserted in this action and led to a multi-million dollar jury verdict. To the extent that the Court should consider the results in *Tawney*, however, the Court must also consider the results in *Poplar Creek Development Co. v. Chesapeake Appalachia, LLC*, Civ. No. 7:08-000190-GFVT (E.D. Ky.), discussed above, in which the federal district court held that West Virginia law and Kentucky law are different on the issue of calculating royalties.  In that case, Judge VanTatenhove held that Chesapeake's method of calculating royalties was in accord with Kentucky law.

Given these considerations, the Court finds that, in negotiating the settlement amount, Class Counsel has adequately evaluated the likelihood of success on the merits of the claim for wrongful deduction of expenses.  As part of this evaluation, Class Counsel considered the possibility of an award of pre-judgment interest and punitive damages.

The Poplar Creek Objectors argue that the settlement amount is unfair because the Mahonia years are not weighted enough to reflect the injuries caused by the Mahonia contracts.  However, Class Counsel explains in its response that the Mahonia contract years (February 2000 to March 2001 and April 2002 to February 2006) constitute 29.9% of the claims period but these years are allocated 52.25% of the total Net Settlement Fund. Class Counsel explains that the allocation method recognizes that damages were greater during the years when the gas was sold under the Mahonia contracts but that damages incurred during the early years of the claims period – from February 1992 to January 2000 – are entitled to a comparative enhancement to reflect the time value or interest

13

accrual associated with the damages.

Given these considerations, the Court finds that the allocation method fairly reflects the injuries caused by the Mahonia contracts and the injuries suffered during the early years of the claims period.

The Poplar Creek Objectors object that the settlement payments are unfair because they are not based on the true amount of gas produced by each class member. The objectors argue that one of the claims in this action is that Chesapeake fraudulently reduced the volumes of gas on which it paid royalties to class members so that the Defendants paid royalties on only 95% of the gas they sold. The objectors argue that settlement payments should be calculated based on the measure of actual gas sold.

However, Class Counsel points out that, in negotiating  the settlement amount, they considered the merits of the claim for wrongful deductions of volumes. Further, Class Counsel states that calculating the true amount of gas produced by each class member would be unduly burdensome and time consuming. Finally, the objectors have not indicated that such a calculation would change the settlement payment to individual class members. Class Counsel indicates that the change in payment amount would be negligible and would not warrant the time delay.

For all these reasons, the Court overrules the Poplar Creek objections.

**D.      Individuals who Appeared at the Fairness Hearing.**

Four individuals or entities filed Notices of Intent to Appear at the Fairness Hearing. These were Jewell Bollinger, Janet C. Mullins, Ruie M. Regan, and the Poplar Creek Objectors. With the exception of the Poplar Creek Objectors, none of the other three filers appeared at the hearing when invited to do so by the Court.

14

The Court further invited anyone present at the Fairness Hearing to comment on the proposed settlement. In response, Ruth Anna Brust, Jerry Martin, Barbara Sutherly, and V.L. Farley asked to be heard. None of these four individuals filed objections to the settlement. Further, their comments made at the hearing did not constitute objections to the settlement. Nor did their comments constitute any reason to find the settlement is not fair, reasonable and adequate.

## V.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

The Court's analysis of the propriety and fairness of the Settlement Agreement, however, does not end with an analysis of specific objections raised. Fed. R. Civ. P. 23 states that the Court may approve a settlement that would bind class members only after a hearing and a determination that the settlement is fair, reasonable and adequate. Fed. R. Civ. P. 23(e)(2). As noted previously, the Court conducted a Fairness Hearing on November 10, 2009, at which counsel for the parties and several class members were present.

The Sixth Circuit has identified seven factors that should aid a court in its determination of whether a class action settlement is fair, reasonable, and adequate: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

### A.   The Risk of Fraud or Collusion

"Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary." *Leonhardt v. ArvinMeritor, Inc.*, 581 F.Supp.2d 818, 838 (E.D. Mich. 2008); *see also In re Telectronics Pacing Sys.,* 137 F. Supp. 2d 985, 1016 (S.D. Ohio 2001) (citing

15

Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.51 (3d ed. 1992)) ("Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered"). This case was filed in this Court almost three years ago. The parties have engaged in extensive motion practice, including the filing of multiple briefs on motions to dismiss and on motion for class certification. The parties exchanged documents and depositions were taken of the Class Representatives and of representatives of Defendants. Throughout this litigation no allegation of fraud or collusion has ever been made against the parties.

The Settlement Agreement also is the product of arm's-length, good-faith settlement negotiations. The parties engaged in over four months of arms-length settlement discussions during which the parties exchanged data which allowed both sides to become acquainted with the relative strengths and weaknesses of the claims and defenses at issue. Accordingly, the Court finds that the evidence before the Court indicates that the risk of collusion among counsel is nonexistent.

### B.   The Complexity, Expense and Likely Duration of Further Litigation

In evaluating a proposed class settlement, the Court must also weigh the risks, expense and delay the plaintiffs would face if they continued to prosecute the litigation through trial and appeal. *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003); *Telectronics*, 137 F. Supp. 2d at 1013. The Court concludes that this factor weighs heavily in favor of finding the settlement fair and reasonable.

This case was extremely complex, both factually and legally. As highlighted by *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, Civ. Action No. 7:08-190-GFVT (E.D. Ky.), a number of the issues being litigated in this action are novel to Kentucky. Given the unsettled nature of the law with respect to certain claims, a resolution of these issues by the Court would have constituted

a significant risk for the Class.

Proceeding without a settlement in this action thus exposed the Class to risk in connection with establishing the factual bases to support some of the Class's legal theories, in proving damages, and in collecting any amount that is ultimately awarded. The Settlement Agreement obviates that delay and will advance the recovery to the Class at a significantly early stage of the litigation. Undoubtedly, this relief is preferable to the possibility of a smaller recovery, or none at all, after an expensive and protracted trial and appeal are completed.

### C.    The Amount of Discovery Engaged in by the Parties

The parties litigated for nearly two years before entering into settlement negotiations. In connection with the litigation, the parties engaged in significant investigation and discovery in this matter, including exchange of documents, depositions of Class Representatives and Defendants' personnel, a full review and analysis of approximately 1,200 oil and gas leases between Defendants and their Kentucky lessors, and a full review and analysis of the proceedings, evidence, and rulings in the other class actions for underpayment of royalties.

Further, the underlying substantive claims of the Class involved complicated formulas applied to the calculation of gas royalties, which required the parties to become familiar with gas wells and leases, the data associated with the wells and leases, the proper practices of lessees in accounting to lessors for extraction of natural gas, transportation, processing, and sale of same. The parties thus devoted significant time to studying the various methods by which gas royalties can be calculated in order to litigate the claims of the Class. Finally, the parties engaged in extensive, arms-length negotiations for over four months, which also allowed the parties to fully explore their respective factual and legal positions.

17

All this information ultimately allowed the parties to frankly evaluate the merits of and risks inherent in their respective cases and to determine an appropriate settlement value. Accordingly, the formal and informal discovery exchanged by the parties was thorough and appropriately tailored to allow the parties to determine not only an overall settlement amount, but to fairly and adequately determine an allocation of that amount for the Class Members.

### D.   Likelihood of Success on the Merits Viewed in Light of the Form of Relief Offered in Settlement.

"The likelihood of success . . . provides a gauge from which the benefits of the settlement must be measured." *In re Gen. Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1086 (6th Cir. 1984). Given the factual and legal complexity of the case, it is difficult to gauge the likelihood of the plaintiffs' success at trial. The risks associated with further litigation were not trivial. In this matter, the Court finds that the Plaintiffs' likelihood of success on the merits was legitimately possible, but the Court expresses no opinion as to whether it was probable.

Plaintiffs' success on all of their claims at trial was by no means guaranteed in light of the result in the *Poplar Creek* action, which asserted claims similar to two of the claims asserted in this action. Plaintiffs in *Poplar Creek* had their claims dismissed, with Judge Van Tatenhove entering judgment as a matter of law against Poplar Creek. The Settlement eliminates that risk and that alone is a not-insignificant ancillary benefit. Accordingly, the amount and nature of the Settlement Agreement appear to be a reasonable and appropriate tradeoff for the elimination of the risk associated with some of the asserted claims in this Action.

### E.   The Opinions of Experienced Counsel and Class Representatives

In deciding whether a proposed settlement warrants approval, the informed and reasoned judgment of plaintiffs' counsel and their weighing of the relative risks and benefits of protracted

18

litigation are entitled to great deference. *See, e.g., UAW v. Ford Motor Co.*, 2008 WL 4104329 at

\* 26 (E.D. Mich. August 29, 2008) ("[t]he endorsement of the parties' counsel is entitled to

significant weight, and supports the fairness of the class settlement."); *see also Stewart v. Rubin*, 948

F. Supp. 1077, 1087 (D.D.C. 1996) (the trial court "should defer to the judgment of experienced

counsel who have competently evaluated the strength of the proof").

Class Counsel are experienced counsel who have extensively litigated complex class actions

before federal and state courts across a number of jurisdictions. Class Counsel did not rush to

settlement, but rather engaged in thoughtful, narrowly-tailored discovery that would allow them to

appropriately analyze the relative strength of the claims presented and to make an informed demand.

This required a considerable amount of time, thought, and effort.

As for the Class Representatives, they have participated in settlement conferences and, to the

Court's knowledge have been fully informed and involved participants in the settlement negotiations.

None of the named representatives have objected to the Settlement Agreement, or asked to withdraw

from this litigation.

### F.      Reaction of Absent Class members

In analyzing a proposed settlement, it is appropriate to consider the reaction of the Settlement

Class. *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001). "A certain number of

. . . objections are to be expected in a class action. . . If only a small number are received, the fact

can be viewed as indicative of the adequacy of the settlement." *In re Cardizem CD Antitrust*

*Litigation*, 218 F.R.D. 508, 527 (E.D. Mich. 2003). Accordingly, "[a] court should not withhold

approval of a settlement merely because some class members object."*Leonhardt*,581 F.Supp. 2d at

840.

With respect to the unnamed class members, the Settlement Class consists of approximately 8,185 Kentucky landowners who are lessors under natural gas leases with Defendants. Only 12 persons objected and only 67 opted out. The number of opt outs and objections is minuscule in comparison to the number of persons who have elected to participate in the Settlement. The Court therefore concludes that the overwhelming majority of the potential Class Members have no objection to the terms of the Settlement Agreement.

With respect to those who have objected, the mere existence of their objections does not warrant scuttling the parties' agreement. As noted above, the objections fell within five general categories: (1) ownership disputes regarding the Objector's ownership dates for which they are entitled to royalty payments, rather than any objection to the fairness of the Settlement Agreement itself; (2) complaints that the relative portion of settlement owed to Objector is too low, without giving specifics as to why, and stating an intention to appear at the fairness hearing to make a statement; (3) allegations that Defendants engaged in bad acts outside the scope of this Settlement Agreement so that the amount to be paid to Objector in settlement does not seem fair; (4) objection to the requested attorney fee award; and (5) objection filed by counsel on behalf of Poplar Creek, Alma Land and Appalachian Land.  As discussed above, the Court does not find these objections warrant disapproval of the Settlement Agreement.

### G.    The Public Interest

Lastly, the Court notes that there is a federal policy favoring settlement of class actions. *See Int'l Union*, 497 F.3d at 632. The Court can find no principled basis for not adhering to that policy in this matter. In addition, the conservation of the Eastern District of Kentucky's judicial resources, which were significantly expended on the settlement efforts alone, is substantial.  The Court

therefore finds that the public interest warrants approval of the Settlement.

## VI.     APPROVAL OF THE PLAN OF ALLOCATION

The allocation plan distributes the settlement funds to the Class Members under the following criteria: the proceeds of the Net Settlement Fund will be allocated to Class Members based on the type and duration of the lease held by each Class Member, each Class Member's proportionate interest in the lease, the volume of gas produced under the lease, and a weighting formula. The formula takes into consideration the volume of gas produced from each lease between February 1992 and April 2009. For periods 1996 and earlier, the data used for Settlement Payments are estimates. The total volume of gas produced, after certain weighting, will be used to calculate each Class Member's percentage interest in the Net Settlement Fund. The court finds that the allocation is fair and approves the allocation plan.

As a part of its exacting and thorough examination of a class-action settlement, a court must ensure that the distribution of the settlement proceeds is equitable. *Crawford v. Lexington–Fayette Urban County Govt.*, 2008 WL 4724499 at * 9 (Oct. 23, 2008).

The law does not require pro-rata distribution, and given the time period covered by this Settlement Agreement, and the difficulty associated with finding accurate records that will, in some cases, be nearly two decades old, exact calculation of the Class's claims may be difficult, if not impossible. *See Int'l Union,* 497 F.3d at 628 ("Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members; instead the settlement need only be 'fair, reasonable, and adequate.'").  The Court finds that the plan of allocation is fair and reasonable under the circumstances, and approves the allocation plan.

21

VII.   **CONCLUSION**

Accordingly, the Court hereby ORDERS as follows:

(1)     The Motion for Final approval of Settlement Agreement (DE 119) is **GRANTED**;

(2)     The Motion for Attorney Fees (DE 82) is **GRANTED**;

(3)     The Plan of Allocation is **APPROVED**;

(4)     All objections to the settlement are **OVERRULED**;

(5)     The Complaint in this matter is **DISMISSED** with prejudice except that this Court shall retain jurisdiction to the extent necessary to administer and enforce the Settlement Agreement; and

(6)     This Order is Final and Appealable, there being no just cause for delay.

Dated this 3rd day of March, 2010.

Signed By:

*Karen K. Caldwell*

**United States District Judge**